FILED

AUG 2 9 2006

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

GERALD JOHANNES,

        Plaintiff,

    v.

ALAMEDA COUNTY
SHERIFF'S DEPARTMENT; et al.,

        Defendants.

_____/

No. C 04-458 MHP (pr)

**ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY
JUDGMENT**

**INTRODUCTION**

      This case is now before the court for consideration of defendants' and plaintiff's cross-motions for summary judgment. For the reasons discussed below, defendants' motion will be granted and plaintiff's motion will be denied.

**BACKGROUND**

      This action arises out of eight visual strip searches of Johannes while he was housed at the Alameda County Jail. He had been brought to the county jail from Atascadero State Hospital pursuant to a court order because he was needed as a witness to testify in another person's trial. Johannes was searched when he arrived at the jail and each time he returned from court. He contends that the searches violated his Fourth Amendment right to be free from unreasonable searches.

      The following facts are undisputed unless otherwise noted.

United States District Court
For the Northern District of California

A.    The Searches

On September 26, 2003, Johannes was moved temporarily from Atascadero State Hospital to the Santa Rita Jail facility of the Alameda County Jail ("the county jail"), a correctional facility operated by Alameda County through the Alameda County Sheriff's Office.  Johannes was returned to Atascadero on November 6, 2003.  Johannes was brought to the county jail pursuant to court order so that he could serve as a witness in a trial to determine whether Paul Pedersen could be civilly committed pursuant to California Welfare and Institutions Code § 6600.

When the Alameda County Sheriff's deputies went to Atascadero to transport Johannes on September 26, 2003, they did a pat-search of Johannes before they left Atascadero and then upon arrival at the county jail.[1]  He was pat-searched again by the booking staff.  He was interviewed and had limited interaction with booking staff persons. He states that he was "held in a single-man holding cell and had no opportunities for interaction with any other jail inmates."  Johannes Decl., ¶ 4.  He was kept in the holding cell for about 24 hours and was taken to the administrative segregation unit on September 27, where he was subjected to the first strip search and body cavity inspection.

Johannes was transported from the county jail to the Alameda County Superior Court on October 1, 16, 21, 23, 27, 28 and 29, 2003 to provide testimony in Paul Pedersen's trial. On each occasion that he returned to the county jail from court, a visual strip search and/or body cavity inspection was performed on him.  Johannes described the search routine:

> I would be escorted by two deputies to a holding cell in the ad/seg unit and after removal of handcuffs and waist chains, I would be ordered to remove all my (jail) clothes and hand them to the deputies.  I would be required to stand naked facing the deputies while they searched through my clothes.  I would then be directed to hold out my hands in front of me and turn them over for inspection of my palms.  I would then be instructed to raise my arms in the air to expose my underarms.  Then, I would be directed to bend forward from the waist and ruffle my fingers through my hair and behind my ears.  Straightening up, I would be required to open my mouth wide, raise my tongue to the roof of my mouth, and then insert my fingers and run them around my gums.  On two occasions, I was required to remove my upper denture plate and display that to the deputies.  I would then be instructed to expose the underside of my penis and scrotum by holding them with my hands.  I was then required to turn 180 degrees and with my back to the deputies to raise one leg at a time for inspection of the undersides of my feet.  Finally, I would be ordered to bend forward from the waist again and to grab my buttocks with my hands, spreading them to more fully expose

2

1  my anal area for visual inspection. Maintaining that position, I would be required to
2  squat three times, coughing each time. I would them [sic] be permitted to put my
   clothes back on.

3  Johannes Decl., ¶ 10. It is undisputed that the searches were always visual searches and that
4  the deputies never physically touched Johannes during the searches.

5  B.    Johannes' Status

6         When the strip searches took place, Johannes' status was that of someone awaiting
7  civil commitment proceedings. Civil commitment proceedings were pending against him
8  under California's Sexually Violent Predators Act ("SVPA"), Cal. Welf. & Inst. Code §§
9  6600 - 6609.3. Johannes had been convicted in 1993 of "a number of counts of violating
10 California Penal Code § 288(a) and 288.5" and received a ten-year prison sentence.
11 Johannes Decl., ¶ 1.[2]

12        According to Johannes, he completed his sentence in June 1998, but before he was
13 released from prison, a petition was filed in Los Angeles County Superior Court to civilly
14 commit him under the SVPA. The SVPA petition was dismissed in September 1998 by a
15 superior court judge, but that decision was overturned by the state court of appeal in People
16 v. Superior Court (Johannes), 70 Cal. App. 4th 558 (Cal. Ct. App. 1999).[3] Civil commitment
17 of Johannes was sought under California Welfare and Institutions Code
18 § 6600.1, which allowed civil commitment if the victim was under 14 and the acts involved
19 substantial sexual conduct even if not committed by force or violence. The California Court
20 of Appeal issued a writ of mandate and ordered the trial court to vacate its dismissal, thus
21 reinstating the petition. The court held that § 6600.1 modified § 6600(b) "and that someone
22 who commits two or more specified sex crimes against children under fourteen years old
23 with substantial sexual conduct is subject to the Act even if his crimes were not committed
24 with force, violence, menace or fear." Johannes, 70 Cal. App.4th at 562. Johannes states
25 that the following then occurred: "In September, 1999, following a probable cause hearing,
26 the SVP petition was again dismissed, this time on the grounds of no probable cause, and that
27 dismissal was again appealed and was also overturned, in February, 2000." Johannes Decl.,
28 ¶ 1. Over the next four years, he pursued various challenges to the state court decision, and

United States District Court
For the Northern District of California

3

United States District Court
For the Northern District of California

1   chose to be detained at Atascadero rather than the Los Angeles County Jail. Id. He further
2   states that his challenges were denied on procedural grounds "but by February, 2005, all three
3   of the state's experts who had evaluated [him] pursuant to WIC § 6603 had determined [he]
4   did not meet the criteria for involuntary commitment." Johannes Decl., ¶ 1. He was
5   released from custody on March 1, 2005. He later went to Canada and is now in custody at a
6   facility in British Columbia.

7       Accepting as true Johannes' description of his situation, he was unusual in two
8   respects. First, he was being housed in a state mental hospital rather than a county jail
9   pending his civil commitment proceedings, even though he had not yet been committed.
10  Second, civil commitment was sought under a lesser-known provision of the SVPA, i.e., §
11  6600.1, which allowed for commitment of certain repeat child molesters whose crimes were
12  not committed with force or violence.

13  C.   Life In The County Jail

14      Johannes states that he was housed in ad-seg at the county jail for the six weeks he
15  was there. He states that he was always "housed in a single-man cell and not permitted any
16  opportunities for contact with any other inmates." Johannes Decl., ¶ 5. He was allowed out
17  into a common dayroom area for an hour a day, "one inmate at a time, to take showers, use
18  telephones, etc." Id. Other than his trips to the courthouse, he was outside of the ad-seg unit
19  on three occasions: once to go to the medical area, once to go to a video conference room,
20  and once to go to the visiting area for a conference (through a glass partition) with the
21  attorney for the litigant in the case in which he was testifying. Id. He claims that he was
22  handcuffed and escorted at these times and had no opportunities for contact with any other
23  inmates. He does not state that he was strip-searched after movements within the jail.

24      Johannes went from the county jail to court and back again on seven days. On these
25  occasions, handcuffs were put on him before he exited his cell and waist chains were put on
26  him before he left the ad-seg unit. With one exception, the waist chains remained on him
27  until he returned to ad-seg. He also states that he was "held in separate cells or cages,
28  segregated from all other inmates and having no opportunity for contact with any  other

4

United States District Court

For the Northern District of California

1  prisoner, at all times on those dates, including being separately caged during transport." Id.
2  at ¶ 7. Although he was separated from other inmates during transport, the partition was "a
3  wire mesh screen though which small contraband items could conceivably have been
4  passed." Johannes Suppl. Decl., ¶ 3. He further states that he was always under the direct
5  supervision and close monitoring of sheriff's deputies. He also states that he did not receive
6  any personal or attorney visits at the courthouse on the days he had court appointments. On
7  six of the days he went to court, he was not called as a witness or appear in court and never
8  left the holding cells. On October 29, he did testify, and was escorted by a deputy to a small
9  holding room next to the courtroom where his waist chains and handcuffs were removed and
10 then immediately escorted by a bailiff-deputy to the witness stand. The bailiff-deputy
11 remained within two feet of him throughout his testimony. Another deputy-bailiff also was
12 present in the courtroom at this time. No one came near him during his testimony, except the
13 bailiff-deputy guarding him. After Johannes testified, he was escorted back to the holding
14 room, and the handcuffs and waist chains were re-applied. He was strip-searched upon his
15 return to the jail from court on each of the seven days he went to court.

16       When Johannes first arrived at the county jail, a classification detail was done.
17 According to the classification detail, Johannes was classified as criminally sophisticated
18 based on the time he had served in state and county jail facilities. His crime classification
19 "was assessed in accordance with plaintiff's felony sexual charges in violation of California
20 Penal Code section 288(a) and 288.5. Plaintiff's security class was assessed as a result of
21 plaintiff status as a state and county timeserver. The assault classification was assessed
22 according to plaintiff's history of sexual assault. Plaintiff was assigned administrative
23 classification of Administrative Segregation according to his status as a Sexually Violent
24 Predator under the Welfare and Institutions Code section 6600." Keteles Decl., ¶ 3. The
25 classification report shows that Johannes was given an "A" mark (on a scale in which "A"
26 meant extreme, "B" meant moderate, and "C" meant minimal) for criminal sophistication,
27 crime classification, security classification, assault classification, and administrative
28 classification. Keteles Decl., Ex. 10. That report also noted his housing as "ad/seg" and had

5

1 | the "hazard flags" for "SVP" and "CVL" marked. Id. The "SVP" marking is used to identify
2 | the inmates being held under the SVPA and the guide notes that such an "inmate cannot be
3 | housed with criminal detainees unless the inmate has other criminal holds;" the "CVL
4 | designation indicates that the inmate is being held in a civil case only and must be kept
5 | separate from all other non-civil inmates." Keteles Decl., Ex. 11.

6 | E.     The Policy And Reasons Therefor

7 |         The Alameda County Sheriff's Office has a written policy on strip searches. The
8 | policy states that "[i]nmates who have been in direct contact with, or outside of the secured
9 | facility, shall be strip searched (visual observation) upon return to the facility or housing
10 | unit." Keteles Decl., Ex. 13, ¶ II.D.

11 |         Keteles declared that he was familiar with the procedure concerning the transport of
12 | inmates to and from court or otherwise outside of the Santa Rita facility and stated that such
13 | inmates "have the opportunity to gain access to contraband, even if the inmate is in the
14 | general custody and/or presence of sheriff's deputies or officers because the inmate is not in
15 | continuous visual presence of deputies." Keteles Decl., ¶ 10.

16 |         At the court's request, the parties provided information about contraband in the county
17 | jail.

18 |         Defendants  provided evidence that a lot of contraband is found at the facility.
19 | Between January 1, 2000 and June 13, 2006, there were 497 crime reports generated for
20 | incidents involving the discovery of contraband at the county jail. Of those reports, 7
21 | involved weapons, 413 involved drugs or alcohol, and 77 involved other contraband. Thirty
22 | of the 497 crime reports involved contraband discovered in ad-seg housing units. By the
23 | time they filed their supplemental reply, defendants were able to analyze some of the reports.
24 | They provided evidence that 192 of the 497 crime reports were generated for the January
25 | 2003 through June 2006 period. Of those 192 crime reports generated for contraband, 39
26 | were the result of visual strip searches, 13 involved the discovery of contraband concealed
27 | within body cavities, 9 involved the discovery of contraband after a detainee returned from
28 | court, and 13 involved the discovery of contraband in ad-seg units. Defendants also provided

United States District Court
For the Northern District of California

6

United States District Court
For the Northern District of California

1  two reports demonstrating that detainees coming from other facilities sometimes bring

2  contraband. See Borland Decl., Exhs. 48 and 57.

3  Additionally, in the period of 2003 through June 13, 2006, inmates were written up

4  and/or disciplined for having or concealing contraband on 2,341 occasions. These were

5  incidents where possession of the contraband didn't necessarily amount to a crime but did

6  violate jail rules. While defendants were able to show that there were literally thousands of

7  incidents where contraband was found, they did not provide information as to the method by

8  which that contraband was discovered, i.e., whether by pat search, strip search, shakedown,

9  etc.

10  Defendants additionally provided a declaration from Alameda County Sheriff's

11  Deputy Rice, a contraband specialist at the county jail based on his 26 years of experience as

12  a law enforcement officer in the field of corrections. He explained that the need to control

13  contraband within the jail

14  Controlling contraband within Santa Rita Jail is vital to the safety and welfare of the
    jail staff and inmates. Contraband takes different forms and can be used in many
15  ways by inmates. Contraband can consist of an item that is dangerous in and of itself,
    such as a gun, knife, or other weapon. Contraband can also consist of a seemingly
16  innocuous item that can be turned into a weapon or used for unlawful purposes within
    the jail. Contraband can also consist of drugs, alcohol or other controlled substances.
17  Contraband can be used as weapons, as material for fashioning weapons, to serve as
    jail 'currency,' to communicate with other inmates (such as fellow gang members), and
18  for purposes of becoming intoxicated.

19  Rice Decl., ¶ 5. Deputy Rice discussed the use of contraband as "currency": "Inmates can

20  use it to barter and exchange for other items of contraband, favors, services, or even money.

21  Drugs and other intoxicants are a very common form of contraband and command a high

22  price within the jail. Even inmates who do not use drugs have incentive to smuggle them in

23  because they are valuable commodities for purposes of barter and sale." Id. at ¶ 9.

24  Rice also explained that the visual strip search is one of the most important methods

25  used by the jailers to control contraband.

26  Visual strip searches are particularly important when inmates are first introduced into
    Santa Rita Jail from the outside world, or when they return to Santa Rita Jail from
27  contact visits or court appearances. When inmates are outside the secure confines of
    the Santa Rita Jail, they have better access to contraband. Inmates pick up pencils or
28  other seemingly innocuous items from the floor of the courthouse, or are handed items

7

United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

by another inmate or third party present in the courthouse, and then conceal the contraband on their person. In my experience as a deputy at Santa Rita Jail, and in my experience as a courthouse deputy, these occurrences are not unusual. . . .

Visual strip searches are effective both in detecting contraband and deterring inmates from bringing contraband into the jail.

As for detecting contraband, visual strip searches reveal contraband concealed in areas where pat search techniques would not. Requiring an inmate to remove his clothing makes it more difficult for the inmate to conceal or transfer contraband within the waistband, pockets, folds, or seams of his clothing during the search. The clothing itself can be better searched for contraband by thoroughly handling, feeling and shaking it while it is off the inmate's body.

A visual strip search also better reveals any contraband concealed on the inmate's body, especially very small items of contraband such as microwritings. Contraband concealed in the genital area or any other areas not otherwise visible can be discovered and confiscated. I have performed hundreds of visual strip searches of inmates in accordance with ACSO policy and procedures, both as an intake deputy and as a housing unit deputy. I have discovered concealed contraband during those searches on at least a dozen occasions.

Maybe even more importantly, visual strip searches have an obvious deterrent effect. The vast majority of inmates housed at Santa Rita Jail are familiar with jail operations and know that they are going to be strip searched when they first enter into the jail population, when they leave for court and come back, and when they have contact visits. The mere knowledge that they will be strip searched serves as a powerful deterrent to refrain from bringing concealed contraband into the jail.

Rice Decl., ¶¶ 12-16. Rice submitted with his declaration evidence that one new arrival to the housing unit had been caught with tobacco hidden inside a bandage on the detainee's hand which the detainee stated he planned to use to trade for food. Rice also submitted photos of two guns found in the intake booking area that apparently were dumped by arrestees who knew the guns would be discovered in a search.

Deputy Rice also explained that inmates and detainees in ad-seg have the ability to obtain contraband while out for court appearances even though they are segregated from other inmates and are under visual monitoring by sheriff's staff because they are only separated from other inmates during transport by chain-link-type divider. "[C]ontraband can be and often is exchanged through the divider." Rice Decl., ¶ 17. He attached a report of an inmate returning from court who was caught trying to conceal tobacco and cocaine base in plastic wrapping inside his undershorts; that contraband was discovered when the inmate had to remove all his clothing. Id. at Ex. 30.

8

1    Deputy Rice explained that inmates and detainees in ad-seg have the ability to obtain
2    contraband while in the housing unit. "Contraband is often passed by inmate pod workers
3    coming from other housing units." Rice Decl., ¶ 18. Inmates and detainees coming from
4    other correctional facilities "are also known to transport concealed contraband." Id. at ¶19.
5    Tobacco, which until very recently was permitted at Atascadero, has been smuggled in to the
6    county jail. He attached a disciplinary report documenting an attempt by an SVP detainee
7    from Atascadero State Hospital to conceal cigarettes and other contraband items into ad-seg
8    at Santa Rita hidden in his personal effects just two months before Johannes arrived at Santa
9    Rita. See Rice Decl., Ex. 31.

10    Deputy Rice also stated that danger exists even within the ad-seg unit. "Inmate-on-
11    inmate attacks do happen in the Administrative Segregation unit. I am aware of one occasion
12    where an inmate housed in Administrative Segregation was able to jimmy the lock to his
13    door, and thereafter attack and very seriously injure another inmate in the shower with a jail-
14    made weapon. I am aware of another occasion where an inmate was able to deceive the
15    housing technician into opening another inmate's cell door, and the[n] proceed to attack that
16    inmate." Rice Decl., ¶ 21. He also stated that child molesters are targeted for violence
17    within the jail population and often carry concealed weapons for defensive purposes.

18    Johannes submitted a declaration in support of his supplemental brief which tried to
19    downplayed defendants' concern with contraband but along the way he corroborated some of
20    the information defendants presented. He stated that the jail issued pencils and toothbrushes
21    which were shorter than normal but "a resourceful inmate so inclined could easily attach a
22    sharpened toothbrush or pencil to some item suitably fashioned into a handle." Johannes
23    Suppl. Decl., ¶ 1. And he conceded that he was transported to and from court on occasion in
24    a van or bus that also contained "general population inmates, from whom I was partitioned by
25    a wire mesh screen through which small contraband items could conceivably have been
26    passed." Id. at ¶ 3. He also conceded that at least one product (tobacco) was allowed at
27    Atascadero but not at Santa Rita jail in 2003. Id. at ¶ 6. He also stated that numerous
28    inmates went in and out of Santa Rita each day, estimating that "at least a couple of hundred

United States District Court
For the Northern District of California

9

1  inmates return to the jail from court appearances each day." Id. at 7.

2                    **VENUE AND JURISDICTION**

3      Venue is proper in the Northern District of California because the events or omissions

4  giving rise to the claims occurred in Alameda County, which is located within the Northern

5  District. See 28 U.S.C. §§ 84, 1391(b).  This Court has federal question jurisdiction over this

6  action brought under 42 U.S.C. § 1983.  See 28 U.S.C. § 1331.

7             **LEGAL STANDARD FOR SUMMARY JUDGMENT**

8      Summary judgment is proper where the pleadings, discovery and affidavits show that

9  there is "no genuine issue as to any material fact and [that] the moving party is entitled to

10  judgment as a matter of law." Fed. R. Civ. P. 56(c).  A court will grant summary judgment

11  "against a party who fails to make a showing sufficient to establish the existence of an

12  element essential to that party's case, and on which that party will bear the burden of proof at

13  trial . . . since a complete failure of proof concerning an essential element of the nonmoving

14  party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477

15  U.S. 317, 322-23 (1986).  A fact is material if it might affect the outcome of the lawsuit

16  under governing law, and a dispute about such a material fact is genuine "if the evidence is

17  such that a reasonable jury could return a verdict for the nonmoving party." Anderson v.

18  Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

19      Generally, the moving party bears the initial burden of identifying those portions of

20  the record which demonstrate the absence of a genuine issue of material fact.  The burden

21  then shifts to the nonmoving party to "go beyond the pleadings, and by his own affidavits, or

22  by the 'depositions, answers to interrogatories, or admissions on file,' designate 'specific facts

23  showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324 (citations omitted).

24      A verified complaint may be used as an opposing affidavit under Rule 56, as long as it

25  is based on personal knowledge and sets forth specific facts admissible in evidence.  See

26  Schroeder v. McDonald, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (treating plaintiff's

27  verified complaint as opposing affidavit where, even though verification not in conformity

28  with 28 U.S.C. § 1746, plaintiff stated under penalty of perjury that contents were true and

United States District Court
For the Northern District of California

10

1  correct, and allegations were not based purely on his belief but on his personal knowledge).

2  The court's function on a summary judgment motion is not to make credibility

3  determinations or weigh conflicting evidence with respect to a disputed material fact. See

4  T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987). The

5  evidence must be viewed in the light most favorable to the nonmoving party, and the

6  inferences to be drawn from the facts must be viewed in a light most favorable to the

7  nonmoving party. See id. at 631.

**DISCUSSION**

9  A.    The Law

10  The Fourth Amendment to the U. S. Constitution provides the textual source of

11  constitutional protection against "unreasonable searches and seizures" of persons in custody

12  as well as those at liberty. Johannes' claim is analyzed under the Fourth Amendment rather

13  than the Fourteenth Amendment's Due Process Clause. See Albright v. Oliver, 510 U.S. 266,

14  273 (1994) ("Where a particular Amendment 'provides an explicit textual source of

15  constitutional protection' against a particular sort of government behavior, 'that Amendment,

16  not the more generalized notion of 'substantive due process' must be the guide for analyzing

17  these claims.'"). There are several kinds of searches of persons in custody, e.g., a search

18  pursuant to a blanket policy, a search based on individualized suspicion that a person is

19  carrying contraband or weapons, and a search to find evidence. Only the first kind of search

20  -- a search pursuant to a blanket policy -- appears to be at issue in this case, and only that

21  kind of search will be analyzed.[4]

22  A broad-based policy allowing searches without regard to individualized suspicion is

23  evaluated by the test announced in Bell v. Wolfish, 441 U.S. 520, 559 (1970), where the

24  Court considered the rights of pretrial detainees with regard to a detention facility's blanket

25  policy of visual strip searches after every contact visit with a person from outside the

26  institution.

27  The test of reasonableness under the Fourth Amendment is not capable of precise
   definition or mechanical application. In each case it requires a balancing of the need
28  for the particular search against the invasion of personal rights that the search entails.

11

United States District Court
For the Northern District of California

1        Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

2        [Citations.] A detention facility is a unique place fraught with serious security dangers. Smuggling of money, drugs, weapons, and other contraband is all too

3        common an occurrence. And inmate attempts to secrete these items into the facility by concealing them in body cavities are documented in this record, . . . and in other

4        cases.

5  441 U.S. at 559-60. Evidence had been presented in Bell that the visual strip searches were

6  necessary to discover and deter the smuggling of weapons, drugs and other contraband into

7  the institution. The Court acknowledged the extreme intrusiveness of visual strip searches,

8  but nonetheless found them constitutionally permissible. Id. at 560. Bell rejected the idea

9  that the least restrictive alternative methods of detecting weaponry and contraband had to be

10  utilized. See id. at 559-60 n.40. The search in Bell was a visual strip search like that

11  employed on Johannes. See id. at 558 n.39.

12        Blanket policy strip searches with visual body cavity inspection for prison inmates

13  were upheld in Rickman v. Avaniti, 854 F.2d 327 (9th Cir. 1988) (strip searches conducted

14  every time ad seg prisoners left their cells), Michenfelder v. Sumner, 860 F.2d 328 (9th Cir.

15  1988) (routine strip searches of prisoners in a most restrictive maximum security unit every

16  time they entered or exited the unit as well as after movement under escort within the unit),

17  and Thompson v. Souza, 111 F.3d 694 (9th Cir. 1997) (visual body cavity strip search of a

18  prisoner who was one of 129 prisoners selected for an unannounced search of their cells and

19  persons, and he had been selected because his cellmate had a drug disciplinary history).

20  Michenfelder upheld the blanket policy even though it resulted in very frequent strip searches

21  because "so long as a prisoner is presented with the opportunity to obtain contraband or a

22  weapon while outside of his cell, a visual strip search has a legitimate penological purpose."

23  Michenfelder, 860 F.2d at 332-33. Although both Michenfelder and Souza applied the

24  standard for evaluating prison conditions set out in Turner v. Safley, 482 U.S. 78 (1987), they

25  also relied on Bell. At least in the non-prisoner context, Turner did not displace Bell. See,

26  e.g., Demery v. Arpaio, 378 F.3d 1020, 1028 (9th Cir. 2004) (applying Bell test to pretrial

27  detainees' claims regarding webcams in jail).

28

In the margin (vertical text): **United States District Court** / For the Northern District of California

1    In the arrestee context, the Ninth Circuit has found several blanket strip search
2  policies unconstitutional, usually focusing on the reason for the arrest as well as the arrestee's
3  time in custody and access to the general population.  Blanket strip search policies are more
4  likely to be found unconstitutional when applied to pre-arraignment arrestees, especially for
5  those arrested for lesser offenses and for those not in contact with the general population.
6  See, e.g., Way v. County of Ventura, 445 F.3d 1157, 1162 (9th Cir. 2006) (suspicionless strip
7  search during the booking process at a pretrial detention facility of woman arrested for
8  misdemeanor being under the influence of a drug offended the Fourth Amendment); Giles v.
9  Ackerman, 746 F.2d 614, 615 (9th Cir. 1984) (suspicionless strip search of individual
10  arrested on minor traffic offenses during process of being booked into the jail violated Fourth
11  Amendment).

12    Two particular Ninth Circuit cases are helpful to understand the reasonableness
13  analysis when there is a policy for strip searching arrestees.  In Kennedy v. Los Angeles
14  Police Dept., 901 F.2d 702 (9th Cir. 1990), the court held unconstitutional a blanket policy of
15  visual body cavity searches for all felony arrestees in the case of a plaintiff arrested on a
16  charge of grand theft based on a roommate dispute that did not involve any weapons, drugs,
17  contraband or violent acts.  The court did not doubt that detention facilities generally have
18  serious security concerns about drugs, weapons and other contraband.  "Nevertheless, the
19  enacted policy, if it is to be constitutional, must be 'reasonably related' to the penal
20  institution's interest in maintaining security. [Citations.]  A ham-handed approach to policy
21  making runs the serious risk of infringing upon detainees' constitutional rights.  In the instant
22  case, the LAPD fails to offer a serious justification for subjecting all felony arrestees to a
23  body-cavity search as a matter of course, whereas only those misdemeanor arrestees charged
24  with offenses relating to narcotics or suspected of concealing contraband or weapons are
25  forced to undergo such a search." 901 F.2d at 713.

26    On the other hand, a strip search policy was upheld in Thompson v. City of Los
27  Angeles, 885 F.2d 1439 (9th Cir. 1989), where the search was based on the category of the
28  crime for which the individual had been arrested, without any examination of the facts of the

13

1   individual's particular criminal acts. The individual had been charged with grand theft auto,
2   and that offense "is sufficiently associated with violence to justify a visual strip search." 885
3   F.2d at 1447 (arrestee was strip-searched, x-rayed and given a blood test pursuant to jail
4   policy when he was transferred to central jail from sheriff's station); cf. id. at n.6 (expressing
5   no opinion on blanket policy as applied to arrestees charged with other property crimes).
6   The arrestee's contact with other persons in custody also may affect the reasonableness of the
7   search policy, but "by itself cannot justify a strip search." Id. at 1447.

8       A sub-issue in this case is how the SVP detainee status affects the analysis. The Ninth
9   Circuit's two recent decisions on the treatment of SVPs have emphatically declared that civil
10  detainees awaiting civil commitment must be treated at least as well as criminal detainees.
11  See Hydrick v. Hunter, 449 F.3d 978, 996 (9th Cir. 2006); Jones v. Blanas, 393 F.3d 918 (9th
12  Cir. 2004). These cases nonetheless do not treat searches the same as other conditions of
13  confinement and do recognize that institutional security concerns need not be ignored for
14  SVPs.

15      Even though strip searches were among the conditions of which the plaintiff
16  complained in Jones, that case is of little help because the court did not specifically analyze
17  the legality of the strip searches. The Jones plaintiff had the same status as Johannes (i.e., a
18  detainee in county jail awaiting civil commitment proceedings under the SVPA after
19  completing his criminal sentence), but the searches in Jones were distinguishable from those
20  done to Johannes because the Jones searches were done in an allegedly unreasonable manner,
21  i.e., at gun point and by guards engaging in menacing behavior, in front of women,
22  sometimes in the middle of the night, and without any indication Jones had been in contact
23  with outsiders. See Jones, 393 F.3d at 924. The court determined that individuals detained
24  under civil process could not be subject to conditions that amount to punishment, id. at 932,
25  and used the Bell standard to determine whether the conditions were punitive. Significantly,
26  however, Jones recognized that civil detainees could be subjected to "[l]egitimate, non-
27  punitive government interests includ[ing] ensuring a detainee's presence at trial, maintaining
28  jail security, and effective management of a detention facility." Jones, 383 F.3d at 932.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    The more recent SVP case of Hydrick v. Hunter, 449 F.3d 978, 996 (9th Cir. 2006),

2  confirmed that searches of civil detainees and those civilly committed are to be analyzed

3  under the Fourth Amendment, rather than the Fourteenth Amendment's Due Process Clause.

4  Hydrick was a § 1983 class action by persons housed at Atascadero State Hospital who had

5  been civilly committed under the SVPA or were awaiting such commitment proceedings.

6  The plaintiffs had alleged that the defendants' policies and practices subjected the plaintiffs

7  to unconstitutional conditions, including unreasonable public strip searches. Id. at 996. The

8  court pointed out that the "watchword of the Fourth Amendment in every context is

9  reasonableness" and the Fourth Amendment protection "certainly extents to SVPs." Id.

10  Importantly, the court then said:

11        Of course, "the reasonableness of a particular search [or seizure] is determined by
         reference to the [detention] context." Michenfelder v. Sumner, 860 F.2d 328, 332 (9th
12       Cir. 1988). As with any detained person, there are concerns that mirror those that
         arise in the prison context: i.e., "the safety and security of guards and others in the
13       facility, order within the facility and efficiency of the facility's operations." . . .But
         even so, qualified immunity does not protect a search or seizure that is arbitrary,
14       retaliatory, or clearly exceeds the legitimate purpose of detention.

15  Hydrick, 449 F.3d at 996; see also Young v. Thompson, 1993 WL 136954, 992 F.2d 1221

16  (unpublished table case) (9th Cir. 1993) (upholding policy of strip searches and body cavity

17  inspections of a patient civilly committed pursuant to Washington's sexually violent predator

18  act after patient had a family visit). Qualified immunity was not appropriate in Hydrick

19  because, accepting the plaintiffs' allegations as true, the plaintiffs may be able to state a

20  clearly established violation of their Fourth Amendment rights and it was impossible to make

21  such a fact-specific determination of the reasonableness before defendants had a chance to

22  explain their justification for the searches and seizures. 449 F.3d at 996.

23  B.    The Searches Of Johannes

24        To determine whether the search policy applied to Johannes was constitutional, the

25  court must balance "the need for the particular search against the invasion of personal rights

26  that the search entails." Way, 445 F.3d at 1160. Doing so requires the court to weigh the

27  scope of the particular intrusion, the manner in which it was conducted, the justification for

28  initiating it, and the place in which it was conducted. Id.

United States District Court

For the Northern District of California

1    The <u>scope</u> of the invasion of Johannes' personal rights was great. It is well accepted
2    that strip searches with visual body cavity inspections are extremely intrusive. <u>See, e.g.</u>, <u>Bell</u>,
3    441 U.S. at 560 ("We do not underestimate the degree to which these [body cavity strip
4    searches] may invade the personal privacy of inmates"); <u>Kennedy</u>, 901 F.2d at 711 ("The
5    intrusiveness of a body-cavity search cannot be overstated;" they are "dehumanizing and
6    humiliating"); <u>Thompson v. City of Los Angeles</u>, 885 F.2d at 1446 ("The feelings of
7    humiliation and degradation associated with forcibly exposing one's nude body to strangers
8    for visual inspection is beyond dispute.")

9    As strip searches go, however, the <u>manner</u> and <u>place</u> in which Johannes was strip-
10   searched were considerate. There was no physical touching by the guards and the searches
11   were done in a holding cell. There was no evidence that the searches were observed by any
12   other detainees or by staff members of the opposite sex. <u>Cf.</u> <u>Jones</u>, 393 F.3d at 924. There
13   also was no evidence that the searches were done in a menacing manner or at gunpoint.
14   <u>Cf. id.</u> If the strip searches could be done at all, the way in which they were performed on
15   Johannes would not cause concern.

16   The <u>justification</u> for the policy is the critical inquiry in the reasonableness equation.
17   <u>See Way</u>, 445 F.3d at 1161. A policy is not "constitutionally acceptable simply by virtue of
18   jail officials' invocation of security concerns. . . . Rather, the policy must be 'reasonably
19   related' to the [detention facility's] interest in maintaining security." <u>Id.</u> (citations omitted;
20   brackets in source). Defendants here have invoked jail security as the basis for the search
21   policy. The court considers whether the policy of strip-searching everyone who had been in
22   contact with outsiders or outside of the jail upon his return to the facility or housing unit was,
23   in actuality, reasonably related to the Sheriff's interest in maintaining security.

24   The most important factor in the analysis is that Johannes had been outside the
25   physical confines of the county jail just before each time he was searched. His contacts with
26   the outside world provided him with opportunities to obtain contraband before he entered the
27   jail from Atascadero and before he returned from court. The existence of these opportunities
28   to obtain contraband provided a legitimate basis for application of defendants' strip search

16

policy to Johannes. The evidence is undisputed that detainees can and do attempt to bring
2  contraband into the county jail. Defendants showed that, on average, there were about 60
3  incidents a year of contraband being discovered that prompted crime reports to be written for
4  the incidents and there were about two incidents a day of contraband being discovered that
5  violated jail rules. Seven of the contraband incidents involved weapons found in unspecified
6  places. Contraband had been found during visual strip searches and had been found in the
7  body cavities of inmates.

8        Although SVP detainees like Johannes were kept in ad-seg and separate from the
9  general population inmates, ad-seg housing did not eliminate contraband concerns. Ad-seg
10 detainees could pass and receive contraband from general population inmates if they wanted
11 to do so via inmate workers who worked in the ad-seg units and through the metal screen that
12 separated the two groups on the buses and vans that took them to and from the courthouse.
13 Detainees also could obtain items from the floor and other surfaces of the courthouse, as
14 even seemingly harmless things like pens would be considered contraband in jail. Thirteen
15 of the contraband incidents that led to crime reports involved contraband in ad-seg units.

16        The arrestee strip search cases are of limited usefulness because the SVP detainees are
17 very different from arrestees in at least three important ways. First and foremost, Johannes'
18 entries into the jail lacked the spontaneity of most arrests. The planned nature of his travels
19 from Atascadero to the county jail and the seven trips to court gave him time to plan and
20 organize smuggling of contraband into the jail if he was so inclined. An arrest and a trip to
21 jail are usually (at least from the arrestee's perspective) unplanned events. One of the main
22 reasons for the criticisms of searches during booking proceeding is that people who do not
23 anticipate being arrested usually cannot be presumed to have planned ahead to obtain and
24 conceal contraband. Second, unlike many arrestees whose time in custody might be expected
25 to be brief (e.g., until booked and released or until bail is posted), there was no realistic
26 expectation that Johannes would be released from the custody in the near future. He
27 remained in custody in California for about fifteen months after the searches were performed.
28 Third, Johannes had a lengthy and continuous history of incarceration. His lengthy

17

United States District Court
For the Northern District of California

1    institutional history was a factor that caused him to be classified as criminally sophisticated
2    upon his arrival at the county jail. The jailers believed institutional sophistication heightened
3    the risk that a detainee might conceal contraband because he would be more familiar with the
4    jail environment and the value of contraband in the jail. His lengthy custodial history would
5    have exposed him to the value of contraband, the extreme institutional focus on eliminating
6    contraband, and information about how and where to secrete contraband to better avoid
7    detection.

8        Both the defendants and Johannes rely on Johannes' profile to support their arguments.
9    Defendants argue that Johannes had committed crimes of violence and his profile as a violent
10   criminal alone provided reasonable suspicion to subject him to strip searches. Johannes
11   argues that his criminal record provided no basis to search him when he arrived at the facility
12   because it did not involve violence or drugs. Neither side is wholly correct. Johannes'
13   personal characteristics are relevant to the reasonableness of the strip searches to which he
14   was subjected, but only to a limited extent. Cf. Thompson v. City of Los Angeles, 885 F.2d
15   at 1445 (considering whether the policies "in the context of the particular circumstances of
16   this case" raised factual issues sufficient to preclude summary judgment).

17       Johannes seems to suggest that searching him was the same as if the jailers had
18   randomly scooped someone off the street, incarcerated him and strip-searched him. But
19   Johannes wasn't the same as the ordinary person walking down the street. When Johannes
20   arrived at the county jail and each time he was searched, he had this profile: he had a
21   criminal history, he had been in custody for a continuous and lengthy period of time, there
22   had been at least a probable cause determination in the civil commitment proceedings that he
23   presented a present threat of criminal activity, and, most importantly, he had been outside the
24   physical confines of the county jail.

25       It was not improper for the jailers to factor into their security evaluation of Johannes
26   his decade-old child molestation convictions when he first arrived at the county jail.
27   Johannes' previous convictions did not eliminate his rights as an SVP detainee to be housed
28   separately and under non-punitive conditions, Jones, 393 F.3d at 933, but that does not mean

1 | that institutional security concerns had to be ignored when he arrived at the county jail.
2 | However, defendants go too far with their argument that Johannes' criminal conviction
3 | provided reasonable suspicion to believe that Johannes in particular was carrying weapons or
4 | contraband.  Although Thompson v. City of Los Angeles, 885 F.2d at 1447, allowed a strip
5 | search of an arrestee based on the category of crime for which he was arrested, that was a
6 | fresh crime and not a crime that occurred ten years before the search.  Johannes' criminal
7 | conduct was too old to support current reasonable suspicion, regardless of whether his crimes
8 | were violent or not.

9 |      Although the criminal convictions were old, there had been a probable cause
10 | determination in the SVPA civil commitment proceedings that Johannes was currently likely
11 | to engage in violent criminal acts.  By the time Johannes arrived at the county jail, there had
12 | been a judicial determination that the petition stated "sufficient facts that, if true would
13 | constitute probable cause to believe that [Johannes] is likely to engage in sexually violent
14 | predatory criminal behavior upon his . . . release." Cal. Welf. & Inst. Code § 6601.5.  In
15 | order for the SVPA petition to have been filed in the first place, there also had to be a
16 | concurrence by two psychologists/psychiatrists that Johannes "has a diagnosed mental
17 | disorder so that he . . . is likely to engage in acts of sexual violence without appropriate
18 | treatment and custody." Cal. Welf & Inst. Code § 6601(d).

19 |      Johannes urges that there are various alternatives to strip searches to detect
20 | contraband.  However, jailers do not have to use the least restrictive methods to deal with the
21 | problem and do not have to use inferior methods even if they are less intrusive.  See Bell, 441
22 | U.S. at 559-60 n.40.  Johannes claims that various kinds of detecting equipment could be
23 | obtained at a low cost, but his proposals would still leave some contraband undetected
24 | because of the vast array of materials that may be contraband in jail.  Metal detectors don't
25 | detect things without magnetic properties and drug-sniffing dogs and equipment don't detect
26 | non-drug contraband.  He has not shown the existence of practical and less intrusive methods
27 | of search that are as successful as visual strip searches with body cavity searches, even if the
28 | municipality was required to consider alternative methods to search the detainees.

United States District Court
For the Northern District of California

Johannes also downplays the problem of contraband that is not criminal, but that is not a decision for a detainee to make. Those who run the institution, not its detainees, get to decide what is and is not contraband.

On the evidence in the record, no reasonable jury could find that the application to Johannes of the policy of strip searching any inmate or detainee who had been outside the jail was not reasonably related to the legitimate institutional concerns of prevention, deterrence and detection of the introduction of weapons and other contraband into the county jail. The evidence shows a contraband problem exists at the county jail, that contraband adversely affects county jail security, that opportunities existed for Johannes to obtain contraband when he was outside the county jail, and that strip searches with body cavity searches had actually yielded contraband that wouldn't have been discovered otherwise. Defendants' blanket policy of visual strip searches after inmate/detainee contact with the outside world was not a "ham-handed" approach to solving the problem, and instead was a reasonable approach to the institutional interest in maintaining security by trying to stop the flow of contraband into the county jail. The evidence in the record also shows that the particular method of visual strip searches with body cavity search aided in the detection of contraband being brought into the jail, as there was evidence that contraband was discovered in body cavities of some people who were searched and in the clothing of some people who were searched.

Defendants' liability under Monell requires that there be a constitutional violation, as does any individual liability for Sheriff Plummer. See Monell v. Dep't of Social Servs., 436 U.S. 658, 690 (1978); Plumeau v. School Dist. #40 County of Yamhill, 130 F.3d 432, 438 (9th Cir. 1997). Because no constitutional violation occurred on the undisputed evidence, the Alameda County Sheriff's Office is not liable on a Monell theory and Sheriff Plummer is not liable in his individual or official capacity.

/ / /

/ / /

/ / /

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is GRANTED (docket # 27) and plaintiff's motion for summary judgment is DENIED (docket # 36). Defendants' motion to strike is DENIED (docket # 41).  Plaintiff's motion to file a further opposition is GRANTED (docket # 61) and the court has considered the further opposition brief filed on August 16, 2006 in deciding the motion for summary judgment.  Judgment will be entered in defendants' favor and against plaintiff.  The clerk shall close the file.

IT IS SO ORDERED.

DATED: _August 28, 2006_

_____
Marilyn Hall Patel
United States District Judge

21

United States District Court

For the Northern District of California

## NOTES

1.    Johannes states that the deputies were provided with a form "Nursing Discharge Summary Recommended Continuing Care Plan" that provided pertinent information showing that he had no custodial problems. Johannes Decl., Ex. C. As defendants correctly point out, he did not lay a proper foundation for admission of this record. Moreover, the document appears to have been prepared after his trip to the county jail: the pharmacist's signature is dated March 15, 2004, and the "departure date" appears to be March 10, 2004.

2.    California Penal Code § 288(a) provides for the punishment as a felony of "[a]ny person who willfully and lewdly commits any lewd and lascivious act, including any of the acts constituting other crimes provided for in Part 1, upon or with the body of, or any part or member thereof, of a child who is under the age of 14 years, with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the child." Section 288.5(a) provides for increased punishment for the offense of "continuous sexual abuse of a child," which may be shown by three or more acts of lewd or lascivious conduct under Section 288.

3.    Although not material to resolution of the present case, understanding what the California Court of Appeal determined helps this court to make sense of Johannes' status. According to the state court's recitation of the matters in the record, Johannes had been convicted of seven counts of child molestation without force, see Cal. Penal Code § 288(a), against multiple victims, and three counts of continual sexual abuse, see Cal. Penal Code § 288.5. The convictions were based on Johannes' conduct in luring 10-13 year old boys to his home, then touching the boys inside and outside their clothing, and having them touch his penis, which was erect during at least one touching incident. People v. Superior Court (Johannes), 70 Cal. App. 4th 558, 563 (Cal. Ct. App. 1999). The parties did not dispute in that proceeding that "Johannes's convictions involved substantial sexual conduct with children under 14 years old (§ 6600.1), but did not involve force or violence (§6600, subd. (b))." Id.

4.    A search based on individualized suspicion will pass muster if there is an objectively reasonable belief that the particular individual in custody is carrying or concealing contraband or weapons. See Fuller v. M.G. Jewelry, 950 F.2d 1437, 1447 (9th Cir. 1991) (may search for weapons and contraband). "Reasonable suspicion may be based on such factors as the nature of the offense, the arrestee's appearance and conduct, and the prior arrest record." Id. A search that fails as a blanket policy search may be justified if done with a reasonable suspicion with regard to the particular person being searched. See Kennedy v. Los Angeles Police Dept., 901 F.2d 702, 714 (9th Cir. 1990). Defendants do not contend that they had a reasonable suspicion that Johannes in particular was carrying or concealing contraband or weapons. The individualized suspicion search is not at issue and will not be discussed.

          Another kind of search of a detainee  – the search for evidence – also will not be discussed because it is not at issue in Johannes' case. Probable cause rather than the lower standard of reasonable suspicion is required for a body cavity search of an arrestee conducted solely for the purpose of discovering the fruits or evidence of a crime and not for institutional security. Fuller, 950 F.2d at 1447-49 (search for a ring the arrestee allegedly had stolen). Absent exigent circumstances, a warrant is needed for a body cavity search for evidence. Id. at 1449-50.

22